IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

---

PORT HAMILTON REFINING AND          )
TRANSPORTATION, LLLP,               )
                                    )
            Plaintiff,              )
                                    )   SX-2024-CV-00282
vs.                                 )
                                    )
NATIONAL INDUSTRIAL                 )
SERVICES, LLC,                      )
                                    )
            Defendant.              )

---

Motion Hearing

Wednesday, September 19, 2024


BEFORE:      THE HONORABLE YVETTE ROSS-EDWARDS
             Judge Presiding

APPEARANCES:        ANDREW C. SIMPSON, ESQ.
                    Andrew C. Simpson, P.C.
                    2191 Church Street
                    Suite 5
                    Christiansted, VI 00820
                    340.719.3900
                    asimpson@coralbrief.com
                    (For the Plaintiff)

                    KEVIN F. D'AMOUR, ESQ.
                    Barnes, D'Amour & Vogel
                    1131 King Street
                    Third Floor
                    Christiansted, VI 00820
                    340.774.8188
                    kevin.damour@comcast.net
                    (For the Defendant)

RECEIVED
SEP 1 9 2024
SUPERIOR COURT
OF THE V.I.

1          <u>**TABLE OF PROCEEDINGS**</u>

2

JURISDICTION ARGUMENTS.........................3
3   JUDGE'S RULING...............................46

4   TRO EXTENSION HEARING

5   DAVID A. JOHNSON                        PAGE
        DIRECT BY ATTORNEY D'AMOUR..............59
6       CROSS BY ATTORNEY SIMPSON...............64
        REDIRECT BY ATTORNEY D'AMOUR............64
7       RECROSS BY ATTORNEY SIMPSON.............68
        REDIRECT BY ATTORNEY D'AMOUR............68

8

9   FERMIN RODRIGUEZ                        PAGE
        DIRECT BY ATTORNEY D'AMOUR..............70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                       10:00 A.M.

 3            THE CLERK:  Case number SX-24-CV-282, Port

 4   Hamilton Refining and Transportation, LLLP, versus

 5   National Industrial Services, LLC.

 6            THE COURT:  Counsel?

 7            ATTORNEY SIMPSON:  Good morning, Your Honor.

 8   Andrew Simpson on behalf of Port Hamilton.  With me at

 9   counsel table is David Johnson, a principal of the

10   company.

11            ATTORNEY D'AMOUR:  Good morning, Your Honor.

12   Kevin D'Amour making a special appearance for NIS or

13   National Industrial Services.

14            THE COURT:  Good morning again.  The first

15   matter that needs to be addressed today is the

16   jurisdiction issue.  The Court received a supplemental

17   filing on the eve of yesterday.  Does counsel want the

18   opportunity to have further arguments with regard to any

19   filing?

20            ATTORNEY SIMPSON:  Not on behalf of Port

21   Hamilton, Your Honor.

22            ATTORNEY D'AMOUR:  Your Honor, we did

23   receive that yesterday.  As you know, it was late, as

24   the Court received it as well.  I can certainly go

25   through our memorandum of how we have at least addressed
```

1   that recent case.  I can do it now.  I can do it in the

2   context of the hearing.  I'm prepared to address it.

3                THE COURT:  The Court has to address the

4   issue of jurisdiction before we even move onto the

5   hearing.

6                ATTORNEY D'AMOUR:  Correct.  I guess this

7   raises the -- I believe Port Hamilton has put this forth

8   in an effort to demonstrate that the Bankruptcy Court

9   doesn't need to take jurisdiction, that there is some

10  either permissible or mandatory abstention that the

11  Bankruptcy Court can invoke.  We believe, however, that

12  case actually supports our position in that it actually

13  makes it very clear that the -- following the United

14  States Supreme Court precedent that if it is a core

15  matter that involves the interpretation of a court order

16  and, in this case, the court order encompasses the Asset

17  Purchase Agreement as well as the Order of Sale, then it

18  must be, it is the exclusive jurisdiction of the

19  Bankruptcy Court.  So we are prepared to argue that that

20  case actually supports -- that finding actually supports

21  our position.

22                THE COURT:  You keep saying we're prepared

23  to argue.  If it's on the issue of jurisdiction, I want

24  you to make your argument because the Court is going to

25  decide that issue.

```
 1              ATTORNEY D'AMOUR:  Okay.  Happy to.

 2              We believe that the Texas Bankruptcy Court

 3    maintains jurisdiction to interpret its prior orders,

 4    just as any court, any court in the United States, the

 5    best person to interpret an order coming out of the

 6    court is the judge that issued that order or the court

 7    that issued that order.  The United States Supreme

 8    Court, in the case of Travelers Indemnity Corp versus

 9    Bailey, 557 U.S. 137, says that "it is well established

10    that a Bankruptcy Court plainly has jurisdiction to

11    interpret and enforce its own or prior orders."

12              They take the position that their claim to

13    the scaffolding arises out of the Asset Purchase

14    Agreement as a result of the sale in the bankruptcy.

15    The Court issued an order.  We are challenging their

16    interpretation as to what constitutes all, but that

17    interpretation must be with the Bankruptcy Court.  The

18    United States Supreme Court has made it very, very

19    clear.  Nowhere in this brief does Port Hamilton attempt

20    to distinguish Travelers with the Supreme Court

21    precedent because it can't.  Accepting Port Hamilton's

22    argument that the Bankruptcy Court, Texas Bankruptcy

23    Court, should abstain from interpreting its own sale

24    order flies in the face of the Supreme Court precedent.

25              And despite Port Hamilton's argument, this
```

```
 1   is a core proceeding arising in the Bankruptcy Court.
 2   It's as simple as that.  There can be no distinguishing.
 3   This is an asset arising out of the APA, arising out of
 4   the Order of Sale, arising out of the Confirmation of
 5   Sale.  It all stems from that bankruptcy proceeding.
 6   For this Court to take a position that they, Port
 7   Hamilton, can use this court to interpret a prior order
 8   of the United States Bankruptcy Court not only flies in
 9   the face of their jurisdiction but flies in the face of,
10   again, Supreme Court precedent.
11            It is very clear that this type of
12   interpretation of the contract, interpretation of a
13   court order, it is clear that it arises within the
14   jurisdiction of Texas law as well.  If we're going to,
15   as they have -- in their complaint, they had actually
16   set forth their willingness to consent to jurisdiction.
17   They have set forth that this asset, this scaffolding,
18   arises out of this sale.  So not only do the agreements
19   suggest that they consented to the jurisdiction of the
20   Bankruptcy Court, they have to under United States
21   Supreme Court precedent, and again, it's been
22   unchallenged by them.
23            There is a host of cases, and I'm going to
24   go slow so that the court reporter can pick these up.  A
25   host of cases which suggest that Bankruptcy Court
```

1    jurisdiction must be invoked in anything arising under,

2    arising in or related to a case under Title 11.  I would

3    say Martinez Garcia versus FCA.  It is at Westlaw

4    10374703.  I can also cite Wellness Wireless versus

5    Infopia, LLC, and that is 606 Fed App 737.  I can also

6    cite In Re: Cano, 410 Bankruptcy 506.  In all of these

7    cases, when there is an interpretation issue, the

8    Bankruptcy Court took precedent.  You cannot forum shop

9    to think that you can get a better result by coming to a

10   state court or, in this case, a territorial court.

11           The Fifth Circuit of which Bankruptcy Court

12   in the Southern District of Texas sits in also has a

13   host of cases that followed Travelers which is the

14   Supreme Court precedent.  In Re: Chiron Equities, 552

15   Bankruptcy 674; In Re: Hereford Biofuels, 466 Bankruptcy

16   844; In Re: Briar Building Houston, LLC, Westlaw 136355;

17   Lycoming Engines, Westlaw 1976757; Martinez Garcia,

18   Westlaw 10374703.  In all of these cases -- and there

19   are a variety of them from personal injury matters,

20   contract matters -- all fell back to Travelers, the

21   Supreme Court precedent that says the Supreme Court has

22   jurisdiction over matters that arise out of, arise in or

23   are related to the bankruptcy.

24           Both the assets -- again, I'm repeating

25   myself but just to start out this argument, both the

```
 1    Asset Purchase Agreement and the Sales Order invoke
 2    rising in jurisdiction, and these are terms of art used
 3    in bankruptcy to determine whether or not the matter
 4    should remain in the bankruptcy, but it's arising in
 5    bankruptcy because they've invoked the APA, they have
 6    invoked the Sale Order as soon as it arises in a
 7    bankruptcy matter.  This is a challenge whether or not
 8    this asset belongs to them or, as we take the position,
 9    always has been an asset of NIS.  And the reason it's
10    not even mentioned in these orders is that it wasn't an
11    asset to begin with.  It's -- it's just like we argued
12    this earlier in the last hearing, Your Honor, it's just
13    like their trucks, their equipment sheds, their
14    containers.  All of their equipment is theirs.  It was
15    not part of the bankruptcy estate.  It was not for the
16    debtors to sell.
17              We can look at every other contract out on
18    that field, out on that property, and say the same
19    thing.  Vivot's heavy equipment does not belong to the
20    bankrupt estate.  We can go through every list of
21    contractors out on that property and say the same thing.
22    If they were to challenge that Vivot's cranes belong to
23    them, it would go back to the Bankruptcy Court as to
24    whether or not it was an asset that's being sold.  It's
25    just not NIS.  It's NIS forklifts.  They could take a
```

1    claim for NIS forklifts.  They have 100 forklifts, an

2    enormous number of pieces of equipment out there.  They

3    can make that claim, but if that's going to be their

4    challenge, they have to go to the Bankruptcy Court to

5    challenge that, not here.

6          Here, they're making a claim which we

7    absolutely deny is appropriate.  They are making a claim

8    that the scaffolding is theirs.  It was never an asset

9    of the estate.  It's always belonged to NIS.  They have

10   nothing to demonstrate that they have right, title or

11   interest in that scaffold.  If they do, if they make

12   that argument, they have to go back to the Bankruptcy

13   Court, back to the APA, back to the sale order and say,

14   this is an asset we purchased.  If they do do that,

15   they've got to go to the Bankruptcy Court to decide

16   that, not this Court.

17          THE COURT:  How do you reconcile the

18   language in the September 16, 2024, order by Judge Lopez

19   wherein he states as to the parties in that case, of

20   course, that "any arguments between Ocean Point and the

21   purchaser relating to the underlying ownership rights of

22   any assets or shared services system can be heard by a

23   Virgin Islands court."

24          ATTORNEY D'AMOUR:  That was specific to the

25   underground -- again, it's fact specific.  That's

1    talking about the underground easement rights.  The real

2    estate was not sold.  It's not an asset of the estate.

3    Therefore, it can be determined by the Court here.  It's

4    an underground easement that they were talking about,

5    correct?  And if that's the case, that's not something

6    that was sold.  It was excluded.  It was specifically

7    excluded.

8              THE COURT:  But isn't the issue in this case

9    whether the scaffolding or scaffolding contracts,

10   depending on which side of the argument you're on --

11             ATTORNEY D'AMOUR:  Correct.

12             THE COURT:  -- was included in the sale

13   agreement, the same type of issue as was addressed by

14   the Court when it determined that ownership rights of

15   that asset could be heard by a Virgin Islands court?

16             ATTORNEY D'AMOUR:  It is not, and the

17   distinction is, again, it was not included.  It was a

18   claim that they made.  They chose to make that claim in

19   the Bankruptcy Court.  I mean, the case that they're

20   talking about that came out yesterday, that we just saw

21   yesterday, that's out of the Southern District of Texas,

22   not out of the Virgin Islands.  Now --

23             THE COURT:  Correct, but the Court in the

24   Southern District of Texas is saying the issue regarding

25   the ownership of this asset can be heard in the Virgin

1    Islands, and, in fact, we're going to defer it down to

2    the Virgin Islands court.

3              ATTORNEY D'AMOUR:  They chose to abstain,

4    the Court chose to abstain -- not mandatory abstention.

5    They chose to abstain because, again, this was not

6    included in the assets of assets purchase.  Now, they're

7    going to come back and say, look, if -- they are saying

8    this was included in the asset purchase.  That's their

9    claim.  We're saying, hey, it never was.  We're prepared

10   to argue the matter in Texas.  We are not prepared to

11   argue it here because we don't believe this Court has

12   jurisdiction.  If the Court does accept jurisdiction, it

13   flies in the face of Supreme Court precedent.  I don't

14   know how you get around that.  That's the challenge, I

15   think, this Court has.  I think that's an easy one.

16   Nobody is harmed by the matter being decided in Texas.

17   No, there is no harm in there.

18             They've already taken the position -- we

19   disagree with it -- that we've moved certain assets

20   already off the island.  That's their position.  We

21   don't believe that's the case.  Their position is that

22   we moved it to Florida.  We've moved it to Louisiana.

23   We've moved it.  Now, what they are talking about is

24   that all these assets are in all of these jurisdictions.

25   Wouldn't it be better for the Bankruptcy Court to decide

1    the issue because, otherwise, we're going to have state

2    court actions all over?

3                So I don't know how they're going to

4    overcome the Supreme Court precedent.  I don't know how

5    they're going to overcome the concepts of efficiency

6    when they are suggesting that these assets are scattered

7    all over the United States.  Wherever there is a

8    scaffold that may belong to them, they have to file an

9    action in that state to recover it.  That's going to be

10   that simple.  I don't know how we can get around that.

11               And in that case -- I'm looking for it very

12   quickly -- we were challenged, frankly, by the late

13   notice but, again -- bear with me one moment, Your

14   Honor.  I just want to get the case in front of me.

15               Thought I had it right here.  The language

16   of that case is actually very specific.  It actually

17   relates directly to what we're talking about, and the

18   Court basically says -- I'm going to try and remember it

19   verbatim, but the Court basically says that it retains

20   exclusive jurisdictions for all matters.  It found an

21   exception in this case, because it took the position

22   that this was an excluded asset, specifically excluded.

23   There is no mention of scaffolding in this.

24               THE COURT:  But isn't that your position,

25   though, that the scaffolding and scaffolding contract

1    contract is specifically excluded?

2              ATTORNEY D'AMOUR:  No, it's just not

3    mentioned because that's not an asset of the estate.

4    That's not something that needs to be specifically

5    excluded.  It's just like their forklifts; it's just

6    like their trucks; it's just like everything else that

7    they own.  It's something they own.

8              THE COURT:  So if you are taking the

9    position that it's not even mentioned, then why can't

10   this Court decide the issue?

11             ATTORNEY D'AMOUR:  Because they make the

12   claim.  They've said it.  They said their ownership

13   rights arise out of the APA.  We didn't raise the issue.

14   For two and a half years, almost three years, we have

15   been operating under the assumption, under the ownership

16   rights of this equipment.  We've maintained it.  We've

17   followed all the protocols regarding OSHA.  We've done

18   everything we're supposed to do because it's ours.

19   Nobody claimed that these underground easements belong

20   to anybody but the landowner.  They're not the

21   landowner.  They acquired assets not real estate.  They

22   invoked the APA.  They invoked the Sale Order.  They

23   invoked the jurisdiction of the Bankruptcy Court.

24   They've admitted it.  They've accepted it.  They've

25   signed off on it.  The United States Supreme Court

```
 1    precedent supports them that Bankruptcy Court has
 2    jurisdiction.  This Court doesn't.  I don't know how we
 3    get around it.
 4              THE COURT:  Because, again, given the ruling
 5    yesterday where the Court, the Bankruptcy Court,
 6    abstained from hearing the issues on ownership, it seems
 7    to this Court that the Court recognized some concurrent
 8    jurisdiction with the local court to decide this issue.
 9    How do you respond to that?
10              ATTORNEY D'AMOUR:  I don't think the Court
11    went that far.  I think the Court was very fact-specific
12    because this was an excluded asset.  It was very clear
13    to them.  If somebody wants to argue it, let the local
14    people argue over the real estate issue which was not
15    part of the estate.  They took a very clear position.
16              THE COURT:  Does this Court have concurrent
17    jurisdiction?
18              ATTORNEY D'AMOUR:  No, it does not.  It does
19    not.  And they cited nothing to support that.  I have
20    found nothing to support that.  It's their position --
21    he actually -- Attorney Simpson actually raised that in
22    the last hearing.  He filed supplemental briefs.  He
23    didn't raise it.  We didn't see anything about
24    concurrent jurisdiction.  I mean unless you read
25    something that I didn't in my brief and in his brief, he
```

```
 1    didn't raise it.  So I didn't address it, and we found

 2    nothing to support concurrent jurisdiction.  I think the

 3    one thing that we can keep coming back to is Supreme

 4    Court precedent, United States Supreme Court precedent.

 5              THE COURT:  Do the cases that you cited all

 6    reference the same cases that you included in your brief

 7    filing?

 8              ATTORNEY D'AMOUR:  In some cases, yes; in

 9    some cases, no, because some of it arises out of the

10    research based on cases that he brought up yesterday,

11    which is why we're not -- I can supplement this, but we

12    didn't have the time.  If you want to give me an

13    opportunity, I'm happy to do that.

14              THE COURT:  Anything further?

15              ATTORNEY D'AMOUR:  Yes.

16              But there are conditions of mandatory

17    abstention.  This gets to the concern you have about

18    mandatory or permissive abstention.  There is a list of

19    cases again that talk about mandatory abstention.

20    Mandatory abstention does not apply to the Texas

21    Bankruptcy Court, because the Bankruptcy Court is

22    interpreting its own order, a core arising in

23    proceeding.  Again, that gets back to whether or not

24    this is a core proceeding, which it is, because it

25    requires the interpretation of a court order; and, two,
```

```
 1    it is arising because, again, interpretation of a court

 2    order.  The conditions for mandatory abstention under

 3    28 U.S.C. 1334(b) are not met in this instance.  "For

 4    mandatory abstention to apply, the following criteria

 5    must be fulfilled:

 6              "One, the claim lacks independent basis for

 7    federal jurisdiction apart from 134(b).

 8              "The claim is a non-core proceeding.

 9              "Three, the corresponding action has been

10    initiated in state court.

11              "The action has been timely adjudicated in

12    state court."  There has been no adjudication of

13    anything related to this Court.  We're immediately

14    challenging the jurisdiction of this Court.  As outlined

15    in Martinez Garcia at Westlaw 10374703, referencing TXNB

16    internal case 483 f.3d 292, "Moreover, it is established

17    that core matters include claims that arise under

18    Bankruptcy Court Code and arise in bankruptcy cases

19    whereas non-core matters are those that relate to a

20    bankruptcy case but do not arise within it or under

21    Bankruptcy Code.  Issues of interpretation and

22    enforcement of a bankruptcy court order and confirmed

23    plans fall squarely within the core proceedings arising

24    in a bankruptcy case."  And that's in Chiron Equities

25    552 B.R. 684 and 685.
```

1            Port Hamilton incorrectly attempts to

2  characterize this unequivocally core as non-core citing

3  In Re: Dunn Energy at 575 B.R. 716 in a manner that does

4  not align with the current case.  Despite Port

5  Hamilton's referencing an out-of-context quote in, in

6  Re: Dunn Energy for the claim that the state court

7  action exists independently of the bankruptcy case do

8  not arise in such case.  In essence, In Re: Dunn Energy

9  was about the creation of a liquidating trust aimed at

10  addressing pre-bankruptcy state law actions.  This has

11  nothing to do with anything that occurred prior to this

12  bankruptcy.  There is no state court action involving

13  Port Hamilton and NIS as to this asset.  The only way

14  this asset arises, again, is through the creation of an

15  APA and the bankruptcy sale and bankruptcy Sale Order.

16            Consequently, since the Texas Bankruptcy

17  Court's interpretation of its prior originates from

18  within LBR bankruptcy case, it qualifies as a core

19  proceeding rendering mandatory abstention irrelevant.

20  The Bankruptcy Court should not permissibly abstain

21  interpreting its own prior order.  Permissive

22  abstention, again, was not addressed by Port Hamilton in

23  its jurisdictional brief.  However, now that the Court

24  has raised that as a potential issue, more factors weigh

25  against permissive abstention than those that support it

1    and are less significant in this context making

2    permissive abstention under 28 U.S.C. 134(c)(1)

3    inappropriate.

4              As established, abstention is an exception

5    not the rule and in your case, one can argue this is an

6    exceptional issue.  It's not the rule.  The rule is that

7    this Court should not have jurisdiction and the

8    Bankruptcy Court in Texas should.  As established,

9    abstention is not the exception -- is the exception, not

10   the rule.  And that's Carnero G&P versus SN EF Maverick,

11   657 B.R. 203 at 213, and they cite the case of Colorado

12   River Water Conservation District versus United States.

13   Courts typically assess several equitable factors,

14   including the effect on an efficient estate

15   administration if abstention is recommended, the extent

16   to which state law issues predominate over bankruptcy

17   issues.

18              Number 3, the complexity or the unsettled

19   nature of applicable law.

20              4, the presence of related state court or

21   non-bankruptcy court proceedings.

22              5, the jurisdictional basis aside from 228

23   U.S.C. 134.  Now, let me touch on that just a little bit

24   because there's a total of 12 factors.  In that case, we

25   do have diversity.  They pled that their client is a

1   Virgin Islands entity and that NIS is a Florida entity.

2   We clearly have a matter well over $75,000.  So when we

3   talk about those two things, the District Court may be

4   more appropriate, but we'll get to that in a second.

5              Number 6, the relatedness or remoteness of

6   the proceeding to the main bankruptcy case.

7              Number 7, substance over form of a core

8   proceeding.

9              8, feasibility of severing state law claims

10  from core bankruptcy matters.

11             9, the burden of the Bankruptcy Court's

12  docket.

13             10, potential forum shopping, which we

14  believe that this is an absolute case of forum shopping

15  on their part, because the case they already submitted,

16  that case was filed in state court -- I'm sorry, in

17  Bankruptcy Court in Texas.  It wasn't filed here.

18             The right to a jury trial.  Well, we don't

19  have that here.  The Bankruptcy Court orders both

20  parties to waive a jury trial.

21             The presence of non-debtor parties.

22             So courts comply with these factors flexibly

23  depending on the case and when state court claims it

24  successfully contravenes Bankruptcy Court's orders.

25  Courts often find that factors favoring proceeding with

1   the case in federal court predominate those over factors

2   favoring abstention, and that's In Re: McDermott

3   International at Westlaw 8215341 at page 7.  And that's

4   a Southern District of Texas case from 2023.

5              The factors support Bankruptcy Court

6   jurisdiction over this matter and do not favor

7   abstention in interpreting the APA and the Sale Order.

8   I can go through each of the 12 factors and make our

9   arguments.

10              Clearly, the efficient administration of the

11   estate would be better in Texas.

12              Predomination of territorial law.  There is

13   no particular territorial law that would preempt or that

14   we need to use that would not give them the same rights

15   that they have in Bankruptcy Court.

16              Application of territory law.  There is no

17   reason to abstain.  Any potential issues of territory

18   law are eclipsed by the principles of federal bankruptcy

19   law.  The Bankruptcy Court merely needs to interpret its

20   own order.  The APA, the Sale Order and those

21   significant territorial law issues complicate this task.

22              Other proceeding as a collateral attack.

23   Abstention is inappropriate.  Port Hamilton's separate

24   lawsuit in the Virgin islands is a transparent attempt

25   to sidestep Texas Bankruptcy Court's clear jurisdiction

1    and the jurisdiction for retaining forum selection

2    clause in the APA.  Allowing would reward the parties

3    who are forum shopping and undermining the authority of

4    the Bankruptcy Court.  I think that's the biggest hurdle

5    that they have to overcome because I believe that they

6    are doing just that.  They are forum shopping.

7              Jurisdictional basis.  Abstention is not

8    necessary.  Diversity jurisdiction under 28 U.S.C.

9    1332(a) exists as the parties are diverse and the amount

10    in controversy exceeds $75,000.  I just mentioned that.

11              Relatedness to the bankruptcy case.

12    Abstention is not appropriate even though the plan has

13    been confirmed and the parties are non-debtors.  This

14    proceeding directly relates to the APA and the Sale

15    Order which is the part of this dispute.  The documents

16    explicitly preserve the jurisdiction of the Bankruptcy

17    Court to interpret the APA, the Sale Order, and the

18    Bankruptcy Court is the appropriate forum for this

19    matter.

20              Substance of a core proceeding.  Abstention

21    again is not warranted.  The substance of this case is

22    federal bankruptcy law as it requires interpreting the

23    APA and the Sale Order.

24              No territorial claims, 7.  Again, abstention

25    is unnecessary.  There are no territorial or state law

1  claims to sever from the Bankruptcy Court's core

2  jurisdiction in this proceeding.  The Plaintiff's

3  Complaint is entirely placed on a core bankruptcy

4  matter.

5          No significant burdens.  Again, abstention

6  is not justified.  Port Hamilton's claim that this case

7  will burden the Texas Bankruptcy Court is baseless.  It

8  is a well-suited venue to interpret agreements and

9  orders.  Given the Court's experience with the Limetree

10  bankruptcy, handling Virgin Islands-related matters, it

11  will impose no additional burdens.

12          Interpreting the APA and the Sale Order is

13  not forum shopping.  Abstention is not warranted.  NIS

14  is not engaging in forum shopping by the Texas

15  Bankruptcy Court.  They are.

16          No right to a jury trial.  Abstention is not

17  favored.  The Plaintiff did not request a jury trial in

18  the Texas Bankruptcy Court's interpretation of the APA,

19  and it's not the case -- and the Sale Order -- and

20  the -- or the Sale Order.  This is not a case that

21  requires a jury.  We believe this is the case that is

22  going to be determined as a matter of law, assuming the

23  jurisdictional issues, and/or if we get to the merits.

24  Again, this is a case that a judge can handle, not this

25  Court.

```
 1                    Presence of non-debtors.  While parties are
 2     non-debtors -- one of the parties in this case -- that
 3     factor alone does not outweigh numerous factors
 4     supporting the Court's jurisdiction.  This single factor
 5     does not control the outcome and significantly is
 6     outweighed by the importance of the other factors.  This
 7     Court should not -- the Court should not abstain because
 8     the matter involves Texas Bankruptcy Court interpreting
 9     the APA and the Sale Order.
10                    THE COURT:  If the Court understands
11     correctly, you laid out the reasons why a Bankruptcy
12     Court would abstain from deciding the matter?
13                    ATTORNEY D'AMOUR:  No.  Why abstention is
14     not appropriate.
15                    THE COURT:  But a bankruptcy court?
16                    ATTORNEY D'AMOUR:  Correct.
17                    THE COURT:  Right.  And so those are the
18     factors the Bankruptcy Court will look at to determine
19     whether it's permissive abstention or mandatory
20     abstention?
21                    ATTORNEY D'AMOUR:  Correct.  That's correct.
22                    THE COURT:  How does the fact that this case
23     does not involve the seller, purchaser, successor in
24     interest or an assigned, how does that affect your
25     representation that the Supreme Court mandates that this
```

1    case automatically be transferred to the Bankruptcy

2    Court to be decided?  Does it matter that, in this case,

3    there is a non-party to the APA and the Sale Order?

4              ATTORNEY D'AMOUR:  No.  That's exactly what

5    I just addressed.  It does not matter, because all the

6    other factors weigh heavily against abstention.  If this

7    is the one factor, it's outweighed by the other 11

8    factors.

9              THE COURT:  Right, but what you just laid

10   out guides the Bankruptcy Court on whether it should

11   abstain?

12             ATTORNEY D'AMOUR:  Right.

13             THE COURT:  Are you saying that those same

14   factors should also be considered by this Court?

15             ATTORNEY D'AMOUR:  No.  Not at all.  No.

16   Not at all.  I'm trying to address the juxtaposition of

17   their suggestion that the case -- the order that the

18   Court just issued which didn't even have an opportunity

19   to be appealed yet or addressed by another court but

20   just issued, whether or not their desire to abstain and

21   let the territorial court deal with real estate

22   issues -- they had their own analysis.  I don't know

23   what that analysis was.  I have not read the briefs that

24   the parties filed.  All I know is what I read in the

25   Court Order, and the Court Order is very clear.  It says

1    that the Bankruptcy Court has exclusive jurisdiction,

2    and in only those very rare instances will they do that.

3    So they may have found that rare instance based on

4    facts.  I don't know what those facts are yet.

5             THE COURT:  When you say the Court Order,

6    which Court Order are you referring to?

7             ATTORNEY D'AMOUR:  The Court Order that

8    Mr. Simpson submitted yesterday.  I mean, on Page 3 of

9    that order, even after the entry of Confirmation Order,

10   the Bankruptcy Court maintains jurisdiction to construe

11   its own order.  They cite Travelers which is a Supreme

12   Court case, Grossman which is a Fifth Circuit case.

13   Thus, there are no -- there is no basis for the

14   Bankruptcy Court to mandatorily abstain from construing

15   the Sale Order and any other order of this court.  The

16   Bankruptcy Court also declines to exercise permissive

17   abstention and, instead, makes certain findings about

18   the Sale Order.  The Sale Order says, among other

19   things -- and it goes through a list of six different

20   matters that the Sale Order says.

21             It further went on to say that the debtors

22   were not authorized to sell assets or interests that

23   they did not own.  That, I think, is where we are at

24   today.  They, the debtors, can't sell something they

25   don't own.  They never owned it.  They never exercised

1    ownership interest.  The debtor, Limetree, never said,

2    this is our stuff.  We're keeping it.  Here is a sale

3    order, a bill of sale, inventory list.  They have never

4    done that.  Again, almost three years after the

5    bankruptcy, we're still using this property as it's ours

6    because it is ours.  It's that simple.

7            So this is -- I said it today and I said it

8    in the last hearing, I said, the debtor could have sold

9    the Brooklyn Bridge but they didn't own the Brooklyn

10   Bridge.  So they can't sell it.  They don't have the

11   right to sell it.  In this case, they could have sold

12   the scaffolding, but they didn't own it.  Therefore,

13   they didn't.  They have brought up -- not us -- that

14   their interest arises out of the APA.  It arises out of

15   the Sale Order.  It arises out of the confirmation of

16   sale.  That's the Bankruptcy Court.  It can't get any

17   simpler.  For them to bring up abstention, permissive

18   versus mandatory, that's a red herring.  They are making

19   me work a hell of a lot harder at what should be a very

20   simple proposition.  They are saying they got it because

21   of the sale.  Let the court determine, see if the

22   Bankruptcy Court can determine whether or not they were

23   correct.  We think they're wrong.  I think the facts

24   will certainly play themselves out in a fashion that

25   will make it very clear that NIS has always owned that

```
1    scaffold.  Pre-bankruptcy.
2              One other area that we can't talk about
3    because it's tangentially raised in their brief,
4    although we do not concede that NIS is enforcing the
5    APA's retention of jurisdiction or forum selection
6    clause against Hamilton, NIS could enforce the APA's
7    clause against Port Hamilton because Port Hamilton
8    relies on it for its claims.  That's just what we just
9    said.  The controlling doctrine for federal enforcement
10   of the forum selection clause known as the Intertwined
11   Claims Doctrine or the Grigson test dictates that
12   federal law applies when evaluating the enforceability
13   of such clauses in federal court.  This is illustrated
14   in the case of VarTec Telecom versus BCE where the Court
15   applied federal law to determine the enforceability of a
16   forum selection clause by non-signatories.  And that's
17   at Westlaw 22364302.
18             It's further supported by Dupont versus
19   Rhone Poulenc which collected a series of federal cases
20   applying the Intertwined Doctrine of estoppel, and
21   that's at 269 fed 3rd 187.  The Doctrine allows
22   non-signatories to enforce forum selection clauses
23   against signatory plaintiffs when the plaintiff claims
24   and relies on the terms of the agreement containing the
25   forum selection clause.  Clearly, there is a forum
```

```
 1   selection clause in that APA; and clearly, it says it's
 2   the Southern District of Texas.  It prevents the parties
 3   from having it both ways by asserting claims linked to
 4   the agreement by disregarding its forum selection
 5   clause.
 6            Again, this arises out of the APA, out of
 7   the Order of Sale.  They are signatory to that sale, to
 8   that agreement.  That agreement has a forum selection
 9   provision in there.  They now want to say, all right,
10   because we're a non-party, that does not hold water.
11   There is a series of cases that says it does.  They are
12   stuck with that forum selection provision.  In fact,
13   they exercised that forum selection provision when they
14   were fighting the case in Texas that the order just came
15   out of.
16            Port Hamilton relies on a particular case In
17   Re: Craig's Stores and similar pre-Travelers cases.
18   Most of their reliance is on cases that predate the
19   Supreme Court precedence.  In particular, they are using
20   a Craig's Stores which is -- and there's other cases.
21   It's misapplied as the claims in questions here invoke
22   the Bankruptcy Court arising in jurisdiction which
23   involves interpreting and enforcing its own orders and
24   does not involve related claims as outlined in the
25   Craig's cases.
```

1           Your Honor, again, to sum up, I think it's a

2    very clear case of them forum shopping coming here

3    because they want to muddy the waters over a very simple

4    case.  I think the Court will have a very difficult time

5    overcoming the Supreme Court precedent.  That flies in

6    the face of everything they have said and everything

7    they have failed to address, except for cases that

8    predate that Supreme Court precedent.  Thank you.

9           THE COURT:  Attorney Simpson?

10           ATTORNEY SIMPSON:  Yes, Your Honor.  A lot

11    to unpack there, but I'll do my best.  I think starting

12    out, we need to explain the proceedings that resulted in

13    Judge Lopez's opinion.  Port Hamilton filed a lawsuit

14    very similar to this one in this court.  The Defendant

15    in that case, Limetree Main Terminals, filed the action

16    in the Bankruptcy Court in Texas.  We have not forum

17    shopped.  We have always maintained that these issues

18    belong in the Superior Court of the Virgin Islands.  I

19    believe that case was actually assigned to you, but they

20    also removed it to the Federal District Court here and

21    filed a motion to transfer to Texas.  And that motion is

22    pending.  I expect, based upon Judge Lopez's ruling,

23    that will certainly be denied.  So we are not doing any

24    forum selection.  You can take that factor completely

25    out of the equation.

1          The Travelers case -- actually, before I get

2    to that, what did Judge Lopez say?  He said, this Sale

3    Order says if they are LBR assets, they go to Port

4    Hamilton.  If they are not -- if they were Limetree Bay

5    Terminals assets at the time of the Sale Order, they go

6    to Limetree Bay Terminals; I'm not deciding that issue.

7    That's an issue of state law, territorial law, and

8    that's better decided by the courts in the Virgin

9    Islands where the matter that Port Hamilton filed is

10   pending.

11          That is the same thing here.  If it was an

12   LBR asset at the time the bankruptcy Sale Order was

13   issued, then it transfers to Port Hamilton.  If it

14   wasn't and was owned by NIS, then it belongs to NIS.

15   That's all the bankruptcy Sale Order does, and that's

16   all that Judge Lopez said.  He said that's what this

17   Order does.  We said before the Bankruptcy Court action

18   was even filed, Limetree Bay Refinery owned those

19   assets.  That's an issue of territorial law.  If before

20   the Sale Order was entered, Limetree Bay Refinery owned

21   the scaffolding, then it goes to Port Hamilton.  If,

22   under territorial law, it didn't, it goes to NIS.  Very

23   simple.  Nothing to do with bankruptcy.  The only thing

24   that the Bankruptcy Court does is say, you get -- you

25   Port Hamilton get LBR's assets.  It was very clear from

1   Judge Lopez's opinion, I'm not -- and this Court did not
2   decide ownership of assets other than if they are LBR,
3   they go to Port Hamilton; and if not, they don't.
4   That's all.

5          The Brooklyn Bridge analogy is a great
6   example of that.  Let's say we claim to own the Brooklyn
7   Bridge and we got that through the LBR bankruptcy sale.
8   We don't go through the asset agreement or the Sale
9   Order to determine that.  We look at and that case would
10  be a New York State law to say, well, who's got the
11  deed?  And if there are some issues about the deed and
12  maybe LBR did own it, then Port Hamilton would get it.
13  And if not, as we all expect it's owned by the State of
14  New York, LBR wouldn't get it.  It's very simple.

15          The Travelers case simply says the
16  Bankruptcy Court has the jurisdiction to interpret its
17  order.  It doesn't say that is an exclusive
18  jurisdiction.  We don't dispute that the Bankruptcy
19  Court has the jurisdiction to interpret its order.  But,
20  again, there is no interpretation required.  The only
21  interpretation that I have heard at the last hearing
22  where there was this argument that the very narrow
23  definition of excluded assets or furniture and equipment
24  as an included asset only applies to the stuff that was
25  inside but when you turn to the definition in the

1    appendix, it's very clear that it applies to everything,

2    all sorts of things, equipment and all tangible assets.

3            The Pak-Mor case from the Western District

4    of Texas, I believe, gets into the whole issue of

5    whether an order -- whether interpretation of an order

6    is a core proceeding or not.  And it says, if

7    interpretation involves implementation of the bankruptcy

8    plan, the confirmed bankruptcy plan, then the Court --

9    that's a core matter; but if it's extraneous to that, if

10   it's not implementation of the plan, it is not a core

11   proceeding.  So the plan here is LBR's Plan.  This

12   ownership dispute does not affect LBR's Confirmation

13   Plan.  So it is not a core proceeding even though it is

14   an interpretation of the -- or arguably is an

15   interpretation of the Sale Order.

16           Also, another misconception is the idea that

17   the issue in that case, although I'm not sure it's

18   really pertinent, is that it is an underground easement.

19   That's not the case.  It is above-ground assets, and one

20   of the issues that we think is a territorial issue is

21   whether that is real property or that, as Limetree Bay

22   Refinery claims, is personal property because that

23   affects whether the property transferred the way they

24   claim it transferred.  But, again, the way -- what the

25   bankruptcy Court is saying, these issues of ownership,

```
 1    prior to the asset transfer, are issues of territorial
 2    law and better decided by territorial courts.
 3              The idea that we have to file actions in
 4    many states is a red herring.  We can get an order from
 5    this Court and we can bring an action to enforce a
 6    foreign judgment.
 7              One of the factors that is relied upon was
 8    that there is no diversity -- that there is diversity.
 9    That's wrong.  NIS is a Florida limited liability
10    corporation and Jeff Nations, a resident of Florida, is
11    a principal of that company.  Therefore, the residence
12    for diversity purposes of NIS is Florida.  Port
13    Hamilton's managing agent is an LLC located in Florida
14    and has a Florida member.  Under diversity law, when you
15    are dealing with an LLC or LLLP, you have to look at the
16    citizenship of every single partner; and ultimately,
17    there is a partner who has an ownership interest through
18    the process in Florida.  So we are both Florida citizens
19    for purposes of diversity.  There is absolutely no
20    diversity citizenship in this case.
21              As you noted, the case does not involve a
22    debtor, and that goes back to my point that the core
23    proceeding involves a debtor and implementation of the
24    plan.  That's a core proceeding, but every possible
25    argument that arises out of ownership of assets does not
```

1    affect the debtor, does not affect implementation of the

2    plan and is, therefore, not a core proceeding.

3              My colleague mentioned the Intertwined

4    Doctrine, which is an obscure doctrine which I actually

5    happen to know something about for some reason.  That

6    does involve forum selection clause, but it arises in a

7    situation where there is a straw man trying to avoid a

8    forum -- or a corporation is trying or a company or a

9    person is trying to avoid a forum selection clause by

10   invoking a straw man.  So the corporation is a signatory

11   to the forum selection clause, but it does some sort of

12   transfer to a third party, and they say we are not bound

13   by that.  The Court says, no, this is intertwined, and

14   we're going to make you subject to the forum selection

15   clause.  It has absolutely no bearing on a situation

16   where a party who -- a party in litigation who is not a

17   party to a sale order is trying to take advantage of the

18   of the APA, is trying to take advantage of the forum

19   selection clause in the APA, especially when the APA

20   specifies that there are no third-party beneficiaries to

21   that agreement.

22             So I think that I have covered all of my

23   colleague's points, and I would be happy to address any

24   questions that you have.

25             THE COURT:  You indicated and you repeated

1    several times that whether this is a core issue has to

2    do with whether it involves an implementation of the

3    Assets Purchase Agreement.  Did I understand that

4    correctly?

5            ATTORNEY SIMPSON:  No, Your Honor.  Whether

6    it involves implementation of the confirmed bankruptcy

7    plan which is a completely different thing.  That's how

8    LBR is going to go forward or being wound up or whatever

9    is going to happen with the assets that it got from the

10   sale.  So we paid, I think, $69 million.  That went into

11   a trust.  That is in the trustee's possession.  There is

12   going to be -- there is a confirmed plan for how that

13   money and any other assets or -- not assets, any other

14   money that may have come in through some litigation

15   claims that LBR had against other parties, how that will

16   be distributed.  There is the 3,000 or so plaintiffs

17   from the pollution cases.  That's -- that's what the

18   confirmed plan is, how we're going to deal with that and

19   the other things that are surviving the bankruptcy.

20           THE COURT:  But doesn't a core issue of

21   consideration whether the issues in this case also

22   involve interpretation or enforcement of the Asset

23   Purchase Agreement and Sale Order, not just

24   implementation of the Confirmation Plan?

25           ATTORNEY D'AMOUR:  It doesn't involve the

1    Confirmation Plan at all, and it tangentially involves

2    the Asset Purchase Agreement.  So the Asset Purchase

3    Agreement is simply, in this case, the chain of title

4    for ownership.  So we are saying we obtained title

5    because the Asset Purchase Agreement transferred LBR's

6    assets to us.  And no one is arguing that if it was an

7    LBR asset, it did not transfer to us.  And we are not

8    arguing that if it was not an LBR asset, it transferred

9    to us.  So the examples of Vivot and its trucks and

10   stuff are just irrelevant.  If we were to argue that,

11   that would be an issue of state law, who owns that

12   truck, because what the Bankruptcy Court says, if it is

13   an LBR asset, it goes to Port Hamilton.

14            THE COURT:  And your position is the

15   circumstances that determine whether a particular asset,

16   the scaffolding, is owned by NIS or Port Hamilton

17   relates to circumstances that occurred before the

18   bankruptcy action, and that issue has to be determined

19   as a matter of state law before you can determine if the

20   asset is now an asset of LBR for purposes of the

21   bankruptcy order?

22            ATTORNEY SIMPSON:  Exactly.  And I think my

23   colleague would concede that if LBR owned those assets

24   at the time of the Sale Order, they transfer to Port

25   Hamilton.  So again, the Asset Purchase Agreement, I do

1    not believe, is in dispute.  If they were LBR's assets,

2    they transfer to Port Hamilton.  If my colleague is

3    arguing that, if they were LBR assets, they did not

4    transfer to Port Hamilton, he has not articulated that.

5              THE COURT:  So we have not even gotten to

6    the issue of whether this matter should or should not be

7    transferred to the Bankruptcy Court because we are

8    addressing circumstances that occurred even before the

9    bankruptcy order -- even before the bankruptcy order was

10   implemented?

11             ATTORNEY SIMPSON:  Correct.  I think the

12   final sentence of Judge Lopez's order makes it clear

13   that he doesn't think that he has exclusive jurisdiction

14   over that because he is saying, I'm going to abstain and

15   I'm going to let the Virgin Islands courts decide that.

16             THE COURT:  So your argument is, once the

17   Court determines as a matter of law who is the owner of

18   the asset, then we can get to the issue of whether that

19   asset is within the APA and the bankruptcy order; is

20   that correct?

21             ATTORNEY SIMPSON:  I think once that

22   determination is made, the rest is automatic.  If the

23   Court were to rule it's LBR's -- it was LBR's assets,

24   then it transfers to Port Hamilton.  If the Court were

25   to rule it was not LBR's assets and it's owned by NIS,

1    then it didn't transfer to Port Hamilton.  So, you know,

2    again, I don't think this truly involves interpretation

3    of the APA at all.  Once we have -- once the Court makes

4    that determination, you know, there is a fork in the

5    road, and it goes one way or the other.

6              THE COURT:  What about opposing counsel's

7    position that you conceded in your complaint that, in

8    fact, ownership of this -- the scaffolding or the

9    scaffolding contract is a subject of the APA and the

10   Sale Order?

11             ATTORNEY SIMPSON:  Again, we're describing

12   the chain of title.  It used to be owned by LBR.  We

13   can't come in and sue and say LBR owned this and we want

14   to assert their rights without establishing our right to

15   do that.  Our right comes from the APA.  We say it was

16   owned by LBR.  It went down that fork of the road with

17   the APA and is now owned by Port Hamilton.  That's our

18   basis for being in court asserting that claim, because

19   we don't have a bill of sale to Port Hamilton.  We have

20   an Asset Purchase Agreement.  That is simply the way by

21   which LBR's assets were transferred to Port Hamilton.

22             THE COURT:  Thank you.

23             Anything further?

24             ATTORNEY D'AMOUR:  Yes, Your Honor.  Thank

25   you.

```
 1              All right.  Let's start out with Judge
 2   Lopez's order.  I mean, there is certainly an argument
 3   that can be made.  And, again, I don't know the motion
 4   practice prior to that order, but I assumed there was an
 5   argument he made, the difference between chattel and
 6   real estate.  Real estate, I think, normally --
 7   normally, real estate is governed by the law of the
 8   land.  Where is the land?  The law of that land.  That
 9   could be Judge Lopez's rationale.  I don't know.
10              As far as the scaffolding, a matter of local
11   law, I think -- again, I don't know, but I assume
12   Louisiana, Florida, North Carolina, wherever the
13   scaffolding might be, I assume that they are going to be
14   different local laws that need to be interpreted to
15   determine whether or not -- how that property is owned.
16              THE COURT:  Sounds like counsel is conceding
17   that, in fact, the property is no longer -- the property
18   was, in fact, shipped out of the territory and no longer
19   owned by NIS.
20              ATTORNEY D'AMOUR:  I'm not conceding --
21   that's what they said.  I'm not conceding that at all.
22   They have said that.  In fact, let's go ahead and talk
23   about the Complaint a little bit.  They have alleged
24   Port Hamilton is a Virgin Islands limited liability
25   partnership.  Nowhere does it say, hey, the breakdown is
```

1    anybody from the State of Florida.  It doesn't allege

2    that.  It alleges NIS is a Florida limited liability

3    corporation.  It alleges the need for millions of

4    dollars in scaffolds.  It alleges that there are

5    $6 million worth of scaffolding, scaffolding equipment

6    currently within the boundaries of the facility.  That's

7    their allegations.

8              They believe -- they have alleged that LBR

9    transferred $7 million worth of scaffolding and

10   scaffolding equipment.  They allege that all the assets

11   were acquired as a result of the Sale Order.  They're

12   telling everybody that they -- and he's admitted, their

13   ownership interests, if any, arises out of that APA,

14   simple, straightforward.  That's what they've said.  If

15   that's not a core proceeding determination of who is

16   right and who is wrong, I don't know what is.

17             They have alleged that they acquired this

18   free of clear of all claims and interests from the Sale

19   Order.

20             THE COURT:  And that's because -- correct

21   the Court if it's wrong.  That's because their position

22   is that they properly purchased the assets from LBR, but

23   you have now -- your position is that you're actually

24   the owners of the property?

25             ATTORNEY D'AMOUR:  Correct.

1           THE COURT:  And so doesn't the Court need to

2    determine that issue first, who is the actual owner of

3    the property before we can get to their position that we

4    properly purchased the property from LBR?

5           ATTORNEY D'AMOUR:  Correct.  In Bankruptcy

6    Court.

7           THE COURT:  But isn't that an issue based on

8    circumstances that occurred even before the bankruptcy

9    action?

10          ATTORNEY D'AMOUR:  Okay.  Let's take that

11   position.  We constantly buy scaffolding.  That's a

12   constant process.  So I can't tell you, and I don't

13   think anybody can tell you unless they physically

14   examine their inventory about which of these scaffolding

15   pieces or equipment was acquired when.  Was scaffolding

16   acquired in 1992?  Yeah.  Was it acquired immediately

17   prior to this bankruptcy?  Yes.  So it's a constant

18   process.  The concept that this was acquired -- may have

19   been acquired, some of them may have been acquired

20   pre-bankruptcy, well, if they were going to challenge

21   that, if LBR now has to be a party to this because, now,

22   we're going to have to bring LBR into this to determine

23   whether or not LBR sold it.  So they become a party.

24   They are not just a witness.  If their argument is that

25   they are acquiring as a result of LBR's prior ownership,

1    then LBR becomes a party.  On top of that --

2              THE COURT:  I'm not sure I understand that

3    argument.

4              ATTORNEY D'AMOUR:  Their argument is that

5    LBR acquired the property presumably from NIS or some

6    other entities.  I don't know where they acquired it

7    from.  And then LBR sold it as part of the Asset

8    Purchase Agreement.  That's their position.

9              The suggestion is that some of this is

10   pre-bankruptcy stuff that LBR owned this pre-bankruptcy.

11   Well, if they did, don't we now have to start talking

12   about statute of limitations under this contract and

13   whether or not ownership rights were challenged within

14   six years or if there is some torts involved, don't we

15   have to talk about whether or not there is a two-year

16   statute of limitation?  Again, I don't know.  Again,

17   this is not for this Court to determine this, but the

18   Bankruptcy Court to determine this.  He's raising

19   interesting points but, again, that's just muddying the

20   water further which makes it more appropriate to suggest

21   that the Bankruptcy Court should handle this matter.

22             So they have -- they are asserting this

23   Court's jurisdiction based on their complaint.  Their

24   complaint is set up perfectly for Federal Court

25   jurisdiction.  Perfectly.  They allege perfect

1    diversity.  They allege more than $75,000 worth of

2    assets.  So at a minimum, if the Court decides you're

3    going to take jurisdiction, the next logical step is

4    going to be removal.  So we can go through this -- I

5    think what we're doing is going through a charade right

6    now because, at some point, this Court is going to lose

7    jurisdiction, whether the Court determines that they

8    have no jurisdiction, whether the matter is removed to

9    Federal Court, or ultimately they file this action in

10   Bankruptcy Court.

11           THE COURT:  Right now, though, the matter

12   has not been removed before this court.

13           ATTORNEY D'AMOUR:  No.

14           THE COURT:  And Attorney Simpson has raised

15   questions as to whether there is, in fact, diversity.

16   So this Court is not even concerned about that right

17   now.

18           ATTORNEY D'AMOUR:  But let me make clear his

19   representations.  His representations are that NIS is a

20   Florida corporation and it loses diversity because one

21   of the shareholders of the LLP -- I think that's an LLP,

22   limited liability partnership -- yes, LLLP -- is a

23   Florida resident.  It's their -- I want that to be

24   understood, that that's their position, because that's

25   their allegation.  I mean, I would like that

1   representation.

2          THE COURT:  From where the Court sits, it

3   seems like the issue of diversity is not a proper

4   argument at this stage before this Court.

5          ATTORNEY D'AMOUR:  I agree.  I agree.

6          THE COURT:  And so while you are asking for

7   confirmation over representation, the Court's position

8   is that it's irrelevant for purposes of why we are here

9   today.

10          ATTORNEY D'AMOUR:  Thank you, Your Honor.

11          THE COURT:  The cases that you cited to

12   support the position that this matter should -- that

13   this Court should not assert jurisdiction over this

14   matter, do they address scenarios similar to what we're

15   faced with here whereby the issue of who acquired

16   ownership occurred before the bankruptcy proceeding?

17          ATTORNEY D'AMOUR:  I'm not sure I understand

18   that, Your Honor.

19          THE COURT:  You cited to several cases that

20   you did not include in your filing before the Court --

21          ATTORNEY D'AMOUR:  No, because --

22          THE COURT:   -- and you carefully provided

23   the citations for those cases to further support the

24   position that this Court should not accept jurisdiction

25   of this matter.

```
 1              ATTORNEY D'AMOUR:  Right.
 2              THE COURT:  Do any of those cases involve
 3    the circumstances whereby the issue of ownership --
 4              ATTORNEY D'AMOUR:  Yes.
 5              THE COURT:  -- is an issue based on
 6    circumstances that occurred before the bankruptcy?
 7              ATTORNEY D'AMOUR:  I don't know that.  I
 8    don't know the answer to that, but they do involve
 9    issues of ownership rights to everything from chattel to
10    real estate.
11              THE COURT:  Anything further, Attorney
12    Simpson?
13              ATTORNEY SIMPSON:  No, Your Honor.
14              THE COURT:  Attorney Simpson, I know it's
15    probably been sprung on you all these new case citations
16    to support NIS's position.  Do you want to specifically
17    address any of those?
18              ATTORNEY SIMPSON:  Your Honor, I have not
19    had a chance to read them.  I just heard their names for
20    the first time today.
21              THE COURT:  Because those cases were
22    referenced in court today, the Court is going to take a
23    recess to allow it to review as many of those cases as
24    possible to determine whether there is any similar
25    factual scenario as the one that's before this Court
```

```
 1   before it renders its ruling.

 2            Is there anything further from counsel

 3   before it recesses?  It's going to recess -- the Court

 4   anticipates a recess for approximately an hour and a

 5   half.  Is there anything further from counsel?

 6            ATTORNEY SIMPSON:  No, Your Honor.

 7            ATTORNEY D'AMOUR:  No.

 8            (Whereupon, court stood in recess from 11:08

 9            a.m. to 12:37 p.m.)

10                        AFTERNOON SESSION

11            THE COURT:  Good afternoon.

12            THE CLERK:  Case number SX-24-CV-282, Port

13   Hamilton Refining and Transportation, LLLP, versus

14   National Industrial Services, LLC.

15            THE COURT:  The Court took a brief recess

16   to -- well, an hour-and-a-half recess to allow it to, to

17   the best that it is able, look at many of the cases that

18   were referenced by NIS before rendering a ruling in this

19   matter and is now prepared to proceed with -- well, is

20   now prepared to render a ruling.

21            Before I do so, is there anything else from

22   the parties?

23            ATTORNEY D'AMOUR:  No.

24            ATTORNEY SIMPSON:  No, Your Honor.

25            THE COURT:  Upon consideration of the
```

1  arguments of the parties with regard to whether this

2  Court has jurisdiction to consider the claims raised by

3  Port Hamilton in its complaint, the Court finds that it

4  does have jurisdiction to hear the state claims.

5          The issue of the parties' ownership of the

6  scaffolds, the Court finds, are non-core issues over

7  which this Court can retain that jurisdiction as it

8  clearly implicates court law.  No facts or law derived

9  from the bankruptcy matter are necessary to resolve

10  these claims.

11          A more formal order will be issued.

12          Now that the issue of jurisdiction is beyond

13  us, the Court is ready to proceed with the preliminary

14  hearing.

15          ATTORNEY D'AMOUR:  May I, Your Honor?

16          THE COURT:  Yes.

17          ATTORNEY D'AMOUR:  Your Honor, we are at

18  this moment filing a Notice of Removal, and that should

19  be filed shortly.  For that reason, I would like to at

20  least adjourn the hearing until the Court has reviewed

21  the Notice to Remove.

22          THE COURT:  Attorney Simpson?

23          ATTORNEY SIMPSON:  Your Honor, I think if

24  they file a Notice of Removal, you do lose jurisdiction.

25  Removal will be improper because there is no diversity

1    jurisdiction, but I don't think you are allowed to rule

2    upon that.  That has to be ruled upon by the District

3    Court.  So if that happens, I think you will lose

4    jurisdiction at least temporarily.

5              THE COURT:  The Court understands and

6    realizes that it will lose jurisdiction but if, in fact,

7    removal is appropriate in this case and such a notice is

8    going to be filed, then the Court feels that it's

9    compelled to allow the time for that to happen.

10   Attorney Simpson, you have articulated no basis upon

11   which the Court can say no, it will not allow the time

12   to allow for the filing of that removal other than to

13   point out to the Court that it will lose jurisdiction.

14             ATTORNEY SIMPSON:  No, Your Honor.  I think

15   they should be given a short time to do it, an hour or

16   so.  If it doesn't happen, we should proceed, but --

17             THE COURT:  The Court will grant the time.

18   If that clock is correct, it's currently 1 o'clock.

19   It's not correct?  It is currently 12:41.  The Court

20   will grant one hour.

21             ATTORNEY D'AMOUR:  Thank you, Your Honor.

22             THE COURT:  The Court will recess for one

23   hour.

24             (Whereupon, court stood in recess from 12:41

25             p.m. to 12:45 p.m.)

```
 1              THE COURT:  Counsel?
 2              ATTORNEY SIMPSON:  Your Honor, there is one
 3   matter that I think needs to be addressed before removal
 4   gets filed which would be a request that you extend the
 5   Temporary Restraining Order for five days so that, if it
 6   goes to the District Court, the judge will have an
 7   opportunity to decide whether to continue that or not.
 8              THE COURT:  Have the parties had the
 9   opportunity to discuss it and agreed that it should be
10   extended?
11              ATTORNEY D'AMOUR:  No, we have not.  We have
12   not discussed it, and I do not agree.  I think once the
13   Court -- the Court has given us an hour to file removal.
14   I think we should be honored.  The Court should honor us
15   with an hour, and I advised your clerk that we are
16   filing it momentarily and for her to watch the docket.
17   So I don't think it is appropriate for this Court to do
18   anything until that removal is filed; and once the
19   removal is filed, it loses jurisdiction.
20              THE COURT:  That's what the Court's concern
21   is.  If the Court extends -- well, Attorney Simpson,
22   what is your position with regard to the Court's
23   authority to extend its order overlapping with what may
24   end up being the District Court's jurisdiction?
25              ATTORNEY SIMPSON:  Until it's removed, Your
```

1    Honor, this Court has jurisdiction.  So I think you

2    could issue the order right now.  If it turns out that

3    they got it filed two seconds before, then perhaps that

4    would not be binding.  I don't know how that would work,

5    but I think haste is important.  This is a delaying

6    tactic that is being played.  This could have been filed

7    yesterday or a week ago?

8                    ATTORNEY D'AMOUR:  Your Honor, we

9    contemplated doing that a day ago, a week ago, and all

10   of that, but we wanted to give this Court -- Mr. Simpson

11   brought this matter before this Court, and we wanted to

12   give Your Honor the time to think about it carefully.

13   You obviously did.  You looked at all of our briefs.

14   You made your decision.  And you also have given me one

15   hour to file my Notice of Removal.  I think as a

16   courtesy from the Court to me, I should be permitted

17   that one hour to file my Notice of Removal.

18                    We wanted to hear what the Court's ruling

19   was.  We stood by.  We've come back for two different

20   hearings, and, you know, I think I should be given that

21   courtesy.  We will -- believe me, it's going to be filed

22   momentarily.  I'm sure that -- we were ready to do this.

23   We've got the notices ready.  We have to file it in two

24   different courts, one here and one with the District

25   Court.  We are doing that.

```
 1            THE COURT:  The courtesy has been extended
 2   to you.  You have been given the one hour.
 3            ATTORNEY D'AMOUR:  Thank you.
 4            THE COURT:  The question is whether the TRO
 5   should be extended by five days to allow the District
 6   Court, once it assumes jurisdiction over, to then decide
 7   the issue while the status quo is maintained.
 8            ATTORNEY D'AMOUR:  What are they concerned
 9   about over the next five days?  Or one day?  I mean, if
10   the District Court assigns this matter tomorrow to Judge
11   Molloy or whoever, then that's it, that's the matter and
12   we're done.
13            THE COURT:  Then if there is nothing to be
14   concerned about, maintaining the status quo should not
15   be a concern.
16            ATTORNEY D'AMOUR:  I'm trying to figure out
17   what their concern is.  I haven't heard anything.
18            THE COURT:  Attorney Simpson?
19            ATTORNEY SIMPSON:  Your Honor.
20            THE COURT:  Would you like to address that
21   question?
22            ATTORNEY SIMPSON:  For the same reasons that
23   we moved for the Temporary Restraining Order to begin
24   with.  We're concerned that they will try to remove the
25   scaffolding from the refinery.  We want to maintain the
```

```
 1   status quo.  Five days will give the District Court
 2   barely a chance to get up to speed and decide how it
 3   wants to proceed, and I think we're entitled to that
 4   courtesy.
 5            ATTORNEY D'AMOUR:  Your Honor, they've
 6   already violated the status quo.  They failed to reissue
 7   permits, or they interfered with the issuance of
 8   permits.  Mr. Simpson has more than once violated the
 9   Court's order related to the subpoenas.  He sent out
10   summonses or had summonses signed by the Court a matter
11   of two days ago.  I mean, they are not acting in good
12   faith.  We did everything we could, acting in good
13   faith for this Court, the benefit of the Court, as a courtesy
14   to this Court.  We're doing everything that we're
15   supposed to do.  We have not removed any of the
16   equipment.  We have done everything this Court has asked
17   us to do.  They are asking you to assert jurisdiction
18   beyond the period of time that the removal -- Notice of
19   Removal is likely to be filed.  I mean we are talking
20   minutes here, and, in fact, I apprised your clerk that,
21   look, we're going to get this filed faster.  So
22   please -- we're going to call you out here if we got it
23   done faster so that you didn't wait an entire hour.
24            So I don't see their concern.  We are
25   certainly not going to do anything to violate the
```

1    Court's order.  We're not to going to do anything that

2    we can physically do over the next few days.  We have to

3    be prepared to deal with storms.  If you are saying five

4    days and maintain the status quo, what's the status quo?

5    They've already violated it.  They are terminating our

6    services agreement.  They are calling other scaffolding

7    companies in.  They know -- they are doing everything

8    that they can to interfere with our operation.

9           I can take it one step further and suggest

10   to you that they are now filing frivolous claims with

11   the U.S. Attorney's Office.  So they're doing everything

12   to challenge us.  This is a money grab.  That's all they

13   want out of this.  They don't own anything, never owned

14   it.

15          Now, they're just trying to do everything

16   they can to frustrate NIS, to put them in a bad light,

17   and we are trying to do everything we can to stay within

18   those lines, stay within our lane.  And now, they want

19   you to extend your jurisdiction beyond what I think is

20   appropriate, and I would ask the Court to say, once that

21   Notice of Removal is filed, it has no more -- it has no

22   further jurisdiction, whether or not the District Court

23   picks it up.

24          THE COURT:  The Court recognizes that, once

25   the notice is filed, it does not have any further

1    jurisdiction.  But for purposes of now, you keep

2    indicating that it would not be appropriate.  Why would

3    it not be appropriate for the Court to then maintain the

4    status quo for five days?

5              ATTORNEY D'AMOUR:  For five days?  For five

6    minutes, maybe, for the period of time it takes us to

7    file our notice, but why would your order extend beyond

8    the filing of the notice?  It doesn't make sense.

9              THE COURT:  Attorney Simpson?

10             ATTORNEY SIMPSON:  Your Honor, if they filed

11   it a week ago, they would have been subject to the same

12   order.  Your order remains in place until it expires or

13   until the judge that has the removal deals with that.

14   So there is nothing improper about you issuing it now.

15   The only impropriety would be if it's after Notice of

16   Removal.

17             THE COURT:  Except they didn't file it a

18   week ago.  They've indicated that they are about to file

19   it, and once they do that, this Court loses jurisdiction

20   over this matter.  The order extending the TRO was until

21   today, and so what you are asking the Court to do is to

22   enter an order that's going to affect the District

23   Court's matter.

24             ATTORNEY SIMPSON:  The same as if they had

25   moved it a week ago, Your Honor.  But you have the

1    jurisdiction, you have the power.  They can get up to

2    the District Court and they can move it immediately to

3    vacate it if they want.  You have the power right now,

4    and I submit that the fairer thing to do is to enter

5    that order.

6                    THE COURT:  All right.  First, let the Court

7    say that it's heard a lot or heard some representations

8    regarding the parties extending a courtesy to the Court.

9    I wanted to be known that the parties don't extend

10   courtesy to the Court so that that is clear.

11                   With regard to the request to extend the

12   TRO, the Court is going to grant that request for five

13   days, and upon the filing of the notice, the parties are

14   free to file whatever they need to file in the District

15   Court for immediate action.  But for purposes of now,

16   given the extension of the opportunity to notice the

17   removal of this matter, the Court will ensure that, as

18   best as possible, the status quo is maintained so that

19   the District Court receives this matter in the same

20   posture as where it stands now.

21                   ATTORNEY D'AMOUR:  May I, Your Honor?

22                   THE COURT:  Yes, you may.

23                   ATTORNEY D'AMOUR:  Okay.  In light of that,

24   I would argue that Port Hamilton has already violated

25   the prior TRO.  They have prohibited us from getting the

 1    appropriate permits necessary to move and service the

 2    equipment.

 3           That being said -- and I don't think that

 4    there is any argument there -- I do believe that they

 5    have referred this matter to the U.S. Attorney's Office.

 6    I believe that they are doing everything they can to

 7    thwart our existence.

 8           Now, if that's maintaining the status quo, I

 9    have a different definition of it.  We should be

10    permitted, we should be not prohibited from getting our

11    necessary permits.  We should not be prohibited from

12    getting our equipment down.  We should not be prohibited

13    from maintaining our equipment so that we do not -- we

14    are not in violation of OSHA standards and that we are

15    not in violation of our services agreement.  They are in

16    substantial violation of our services agreement.  They

17    owe us a million dollars; and, yet, they are taking the

18    position and have now succeeded in suggesting to this

19    Court that this Court has jurisdiction; and they are

20    doing everything they can to challenge our mere

21    existence.  I don't think that's fair and certainly not

22    maintaining the status quo.

23           THE COURT:  Attorney D'Amour, the Court

24    hears your argument as a motion to reconsider its ruling

25    it just gave.  Attorney Simpson, how do you respond?

```
 1              ATTORNEY SIMPSON:  Your Honor, statements by
 2   counsel are not evidence.  I have a witness.  We can
 3   call him until the case is removed.  We have not
 4   terminated their scaffoldings services.  We have
 5   terminated other services.  Your court -- your Order
 6   orally issued at the last hearing was to maintain the
 7   status quo, that they could come in and inventory the
 8   equipment and they could secure equipment that was not
 9   in the process because that stuff has to remain because
10   work is ongoing.  We had that discussion at the very
11   end.  They have not done the inventory.  They have not
12   come in and secured the equipment that is not in the
13   units that they said they had to do because of hurricane
14   season; and three weeks later, it's still not done.  We
15   have not violated your order at all, and I'm prepared to
16   put on a witness if you need to do that, but I don't
17   think I should have to since they have not presented any
18   evidence on the facts.
19              ATTORNEY D'AMOUR:  Your Honor, we now had
20   counsel admit that they violated the status quo.  The
21   status quo again is not -- we leave everything the way
22   it is.  He admits that they terminated services contract
23   or parts of the services contract by his admission.  So
24   there is no good faith here.  We cannot get permits to
25   do our work because they're stopping it.  Simple as
```

1    that.

2              THE COURT:  The argument raises concern to

3    the Court.  If the Court entered an order to maintain a

4    status quo so that no one party had a greater advantage

5    than the next.  Based on the argument, it seems that

6    there is information that has not yet been presented

7    that may or may not support that, in fact, Port Hamilton

8    violated the court order.  Are you prepared to do that?

9              ATTORNEY D'AMOUR:  Your Honor, I am.  I

10   mean, if he is going to call the witnesses, I'll ask him

11   the question I need to ask.  And the questions are

12   simple:  Did you do anything to prohibit the issuance of

13   permits?  Did you terminate any services pursuant to the

14   services agreement?  Two simple questions.  And if he

15   has and if Port Hamilton has, then at the end of the

16   day, they violated the status quo.

17             THE COURT:  And the Court is giving weight

18   to your argument, Attorney D'Amour, but what I'm saying

19   to you is, do you want to call any witnesses to go

20   beyond your argument but present some evidence to the

21   Court, because this is the argument that you are

22   advancing that they violated the TRO?

23             ATTORNEY D'AMOUR:  I'll call Hamilton's

24   witnesses.

25             THE COURT:  You're going to call Attorney

59

```
 1   Simpson?
 2              ATTORNEY D'AMOUR:  No.  His client.  There
 3   are two questions I want to ask him, and that's
 4   evidence.  I'll call him as a witness.  He's either
 5   going to tell us the truth or he is not.
 6              THE COURT:  And your witness's name is?
 7              ATTORNEY D'AMOUR:  I don't know.  I don't
 8   know his name.
 9              ATTORNEY SIMPSON:  The gentleman that's
10   sitting beside me is David Johnson.
11              THE COURT:  Mr. Johnson, you are being
12   called to the witness stand as a witness.
13              MR. JOHNSON:  Sure.
14      Whereupon,
15                   DAVID ALAN JOHNSON,
16   having been called as a witness, and having been duly
17   sworn by the clerk of the court, was examined and
18   testified as follows:
19                   DIRECT EXAMINATION
20   BY ATTORNEY D'AMOUR:
21      Q   Mr. Johnson, would you please state your name for
22   the record?
23      A   David Alan Johnson.
24      Q   Mr. Hamilton, what's your position at Port
25   Hamilton, the Plaintiff?
```

```
 1        A    I am one of the owners.

 2        Q    Okay.  And what percentage ownership do you have?

 3        A    65 percent.

 4        Q    So you are the majority shareholder?

 5        A    Yes.

 6        Q    Do you have authority to act on behalf of the

 7   company?

 8        A    Yes.

 9        Q    Are you familiar with the business operation of

10   the company?

11        A    Yes.

12        Q    Are you familiar with the subcontracts that the

13   company has?

14        A    Yes.

15        Q    Okay.  Do you have a services agreement with NIS?

16        A    Yes.

17        Q    Port Hamilton, I'm sorry.  Does Port Hamilton

18   have a services agreement with NIS?

19        A    Yes.

20        Q    Has Port Hamilton terminated any of the functions

21   or duties of NIS pursuant to that services agreement?

22        A    Yes, but not scaffolding related.

23        Q    I didn't -- that's not the question.  Have you

24   terminated any services or any other related matters

25   that is the subject of the services agreement for NIS?
```

Davon C. Johnson - Direct Examination

1     A    Janitorial and other --

2     Q    The answer --

3     A    Not scaffolding related.

4     Q    That's a simple question.

5     A    And I'm giving you simple answers, sir.

6     Q    You're going -- I'm going to ask the question,

7  and you're going to give me answers.  I'm asking you a

8  yes or no question.

9          ATTORNEY SIMPSON:  Your Honor, could counsel

10  be directed to address any objections to you, please?

11         THE COURT:  Counsel, before you proceed, if

12  you have an objection, please address it to the Court.

13         Witness, could you please listen to the

14  question and answer the question that's asked.

15  BY ATTORNEY D'AMOUR:

16    Q    Okay.  Since the injunction was issued, has Port

17  Hamilton terminated any of the services or functions or

18  duties under its services agreement with NIS; yes or no?

19    A    Yes.

20    Q    Okay.  Since the injunction was issued, has Port

21  Hamilton done anything to interfere with NIS getting

22  permits from the refinery and/or the security people at

23  the refinery?

24    A    Not that I'm aware of.

25    Q    In your organization, who would be responsible

Devy - Johnson - Direct Examination

```
 1   for permitting work at the refinery?

 2               ATTORNEY SIMPSON:  Objection.  Vague.

 3               THE WITNESS:  I'm not specifically aware.

 4               THE COURT:  I'm going to allow it.

 5   BY ATTORNEY D'AMOUR:

 6       Q   Do you know anybody at your company --

 7       A   Yes.

 8       Q   -- that is responsible for permitting?

 9       A   I don't know specifically who is responsible for

10   the permitting.  I'm just an investor.  I do not have an

11   operational role.

12       Q   So you then -- the first question I asked you, or

13   one of the first questions I asked you is whether or not

14   you are familiar with the operations of the company.

15       A   I am familiar.

16       Q   Okay.  Do you have decision-making capability?

17       A   Yes.  I'm just not familiar with who does the

18   permits.

19       Q   Who is the operational person at your company?

20       A   Fermin Rodriguez is our VP and refinery manager.

21   He is here today.

22       Q   What's his first name, sir?

23       A   Fermin, F-e-r-m-i-n; last name, Rodriguez,

24   R-o-d-r-i-g-u-e-z; and he is here today.

25       Q   Okay.  Have you done anything to hire additional
```

1    outside personnel for scaffolding matters?

2        A    Yes.

3        Q    And were those outside personnel former employees

4    of NIS?

5        A    I'm not specifically aware.

6        Q    Do you know who would be specifically aware of

7    that?

8        A    Probably Rocco or Fermin as well.

9        Q    All right.  And have you referred this matter --

10   the matters associated with this case, referred this

11   matter to the U.S. Attorney's Office?

12       A    Yes.  I believe crimes have been committed so I

13   did that, yes.

14       Q    You personally did that?

15       A    Yes.

16       Q    Was that a violation of the status quo?

17       A    I don't think so.

18            ATTORNEY D'AMOUR:  Your Honor --

19            THE WITNESS:  If a crime has been committed,

20   then law enforcement needs to be notified.

21            ATTORNEY D'AMOUR:  Your Honor, I'm done with

22   this witness.

23            THE COURT:  Cross-examination, Attorney

24   Simpson?

25            ATTORNEY SIMPSON:  Yes, Your Honor.

Pompey Hamilton - Cross Examination

64

```
 1                    CROSS-EXAMINATION
 2    BY ATTORNEY SIMPSON:
 3        Q    Has Port Hamilton terminated any services with
 4    NIS related to scaffolding?
 5        A    No.
 6        Q    Did you want to terminate the scaffolding portion
 7    of the NIS contract?
 8        A    Absolutely.
 9        Q    And why didn't you?
10        A    Because we can't.
11        Q    And why not?
12        A    Because there is a TRO in place.
13              ATTORNEY SIMPSON:  I have no further
14    questions.
15              THE COURT:  Redirect?
16                    REDIRECT EXAMINATION
17    BY ATTORNEY D'AMOUR:
18        Q    With respect to the scaffolding, do you presently
19    have a bill of sale for that scaffolding?  Does Port
20    Hamilton have a bill of sale for that scaffolding?
21        A    I'm not specifically familiar with that.
22              ATTORNEY SIMPSON:  Objection, Your Honor.
23    This is now getting into the merits.
24              THE COURT:  Attorney, what's the relevance?
25              ATTORNEY D'AMOUR:  He raised it.  He raised
```

1    the question about scaffolding.  I didn't bring it up.

2                    THE WITNESS:  You called me --

3                    MARSHAL WILLIAMS:  Hold on.

4                    THE COURT:  Sidebar.

5                    (Bench conference.)

6                    THE COURT:  The question -- I don't know

7    that it opened the door now to go into all the issues

8    with regard to scaffolding.  How is that narrowly

9    related?

10                    ATTORNEY D'AMOUR:  The way I see as related

11   is Mr. Simpson brought up whether or not they terminated

12   the scaffolding services.  So the question I was going

13   to ask is:  Number 1, do you have any evidence of

14   ownership?  Number 2, what were those services?  And

15   number 3, if those services were being performed by NIS

16   over the past two and a half years.

17                    ATTORNEY SIMPSON:  That's going into the

18   merits.  If he wants to ask what are the services that

19   were not terminated, that would be appropriate, but

20   proof of ownership and all of that has nothing to do

21   with the status quo.

22                    THE COURT:  That's exactly the Court's

23   concern.  What does that have to do with --

24                    ATTORNEY D'AMOUR:  It is a constant pattern

25   of interference.  They continue to do it.  They're doing

Devy Khou Johnson - Redirect Examination

1   literally everything they can to bring down NIS.

2   Literally.  Including the referral to the U.S.

3   Attorney's Office.  That is abhorrent, knowing that we

4   have civil matters pending.  They are pulling every

5   string that they can, and I think that is just reckless,

6   and I think that's a point that the Court -- that should

7   be abhorrent to this Court.  This is a simple case.

8   Ultimately, you accept the jurisdiction, I get that.

9           Number 2, if we're going to remove it, we

10  will move it to Bankruptcy.  That's where we believe it

11  should be.  But more importantly, I think if they're

12  going to be able to challenge the ownership, we're going

13  to be able to demonstrate our ownership, it should be

14  done in a different court and different setting.

15          THE COURT:  But by your asking questions

16  regarding ownership, aren't you going to the crux of the

17  matter to the case, the issuance --

18          ATTORNEY D'AMOUR:  He already answered if he

19  has a bill of sale.  The answer is no.  I'll stop there,

20  Your Honor.

21          (End of bench conference.)

22  BY ATTORNEY D'AMOUR:

23    Q   You just answered a question from Mr. Simpson

24  that the only thing you have not touched is the

25  scaffolding services of NIS; is that correct?

Devy Khou Johnson - Redirect Examination

```
 1    A    As far as I'm aware, because that's a matter of

 2  the TRO.

 3    Q    You've terminated all other services other than

 4  the scaffolding?

 5    A    I'm not specifically aware of all other services,

 6  but I'm aware that more than one has been terminated.

 7    Q    It's your testimony that, even as of yesterday,

 8  you didn't terminate some of the scaffolding services;

 9  is that your testimony?

10    A    I am not aware that any scaffolding services have

11  been terminated.

12    Q    And not yesterday?  You are not aware because

13  that's not your area of expertise or your area of

14  overview or because you have not asked anybody?

15    A    I am not aware specifically of it.  It is not my

16  purview as a director and as a board member that has no

17  operational responsibilities within the refinery itself,

18  and I also have not asked.  I told our team that we

19  should terminate everything with NIS, but I was advised

20  that we cannot terminate the scaffolding-related

21  services.

22    Q    Who advised you, other than your counsel?  Did

23  anyone within the organization advise you of that?

24    A    No.

25            ATTORNEY D'AMOUR:  That's it, Your Honor.
```

Davidson Johnson - Recross Examination

68

```
 1              ATTORNEY SIMPSON:  Redirect.

 2                    RECROSS-EXAMINATION

 3  BY ATTORNEY SIMPSON:

 4     Q    The Temporary Restraining Order says "Defendant

 5  NIS is restrained from shipping any scaffolding it's

 6  removed from Plaintiff's premises."  Has Port Hamilton

 7  violated that?

 8     A    No.

 9     Q    The Temporary Restraining Order says that "NIS

10  shall keep all scaffolding or scaffolding-related

11  equipment it has removed from St. Croix in its present

12  location."  Has Port Hamilton violated that?

13     A    No.

14     Q    Did you review the Temporary Retraining Order

15  that was issued by this Court?

16     A    Yes.

17     Q    Are you aware of any restrictions this Order has

18  placed upon Port Hamilton?

19     A    Absolutely not.

20              ATTORNEY SIMPSON:  No further questions.

21                    REDIRECT EXAMINATION

22  BY ATTORNEY D'AMOUR:

23     Q    Let me be a little bit more precise in my

24  questions.  Has Port Hamilton terminated any of the

25  scaffolding personnel that were formally used -- that
```

Devy W. Johnson - Redirect Examination

```
 1   NIS formally supplied in the past couple of days?
 2       A    I don't understand your question.
 3               ATTORNEY SIMPSON:  Objection.
 4               ATTORNEY D'AMOUR:  I can try it again.
 5   BY ATTORNEY D'AMOUR:
 6       Q    Has Port Hamilton terminated any of the
 7   scaffolding personnel used by NIS in the past couple of
 8   days?
 9       A    I am not aware of any personnel changes.  I'm
10   guessing these would be NIS employees and we would have
11   no capabilities to terminate any NIS employees because
12   they are not our employees.
13       Q    Terminating them from services with Port
14   Hamilton?
15       A    I'm not aware that we have affected scaffolding
16   services within NIS at all, as much as I would love to.
17               THE COURT:  Any further questions?
18               ATTORNEY SIMPSON:  No, Your Honor.
19               ATTORNEY D'AMOUR:  I would like to call
20   Fermin Rodriguez.
21               THE COURT:  The witness may step down.
22               ATTORNEY D'AMOUR:  Your Honor, I have been
23   advised, and I could ask the clerk to check the docket
24   if a Notice of Removal has been filed.
25               THE COURT:  In the interim you understand
```

Fermin Rodriguez - Direct Examination

1    that while the order is under consideration for

2    reconsideration, there is an order of the Court?

3              ATTORNEY D'AMOUR:  I understand.

4              THE COURT:  It's not filed.

5              ATTORNEY D'AMOUR:  Okay.  We'll continue to

6    check then.

7        Whereupon,

8                    **FERMIN RODRIGUEZ,**

9    having been called as a witness, and having been duly

10   sworn by the clerk of the court, was examined and

11   testified as follows:

12                    DIRECT EXAMINATION

13   BY ATTORNEY D'AMOUR:

14       Q   Mr. Fermin -- I'm sorry.  I'm going to move over

15   here because this monitor is blocking me.  Mr. Fermin,

16   state your name for the record, please.

17       A   Fermin Rodriguez.

18       Q   Sorry?

19       A   Fermin Rodriguez.

20       Q   Mr. Rodriguez, sorry.  Mr. Rodriguez, what is

21   your position at Port Hamilton?

22       A   I am the Vice President and Refinery Manager.

23       Q   Are you an owner of Port Hamilton?

24       A   No.

25       Q   You are just an operational person?

71

```
 1      A    Yes.

 2      Q    Are you in charge of the entire operation?

 3      A    Yes.

 4      Q    All right.  Are you familiar with this TRO?

 5      A    Yes.

 6      Q    Are you familiar with the content of the TRO?

 7      A    Yes.

 8      Q    Is it your understanding that the TRO is to

 9 maintain the status quo?

10      A    I'm not sure if I understand the question.

11      Q    Do you know what the word "status quo" means?

12      A    Yes, I know.

13      Q    Okay.  Do you understand that the purpose of the

14 TRO is to maintain the status quo?

15      A    For the scaffold, yes.

16      Q    For what?

17      A    Yes.

18      Q    Do you take a position that Port Hamilton has

19 abided by the TRO?

20      A    Yes.

21      Q    Has Port Hamilton terminated any of the NIS

22 personnel from working on Port Hamilton matters?

23      A    No.

24      Q    No terminations?

25      A    We don't terminate people from other companies.
```

Damon Rodriguez - Direct Examination

72

```
 1      Q    Termination -- let me be more specific.
 2 Terminate them from duties at Port Hamilton.  Not from
 3 NIS, from duties at Port Hamilton.
 4      A    No.
 5      Q    You've not brought in additional scaffolding
 6 people?
 7      A    Yes.
 8      Q    Okay.  And where is that -- what's the name of
 9 that company?
10      A    TIC.
11      Q    TIC?
12      A    Yes.
13      Q    And TIC, does it consist of former NIS employees?
14      A    I'm not sure of the composition of the employees
15 on TIC.
16      Q    Who would know?
17      A    The owner of TIC.
18      Q    Okay.  Is it your testimony that the owner of TIC
19 was not a former NIS employee?
20      A    I'm not sure what's his background.
21      Q    Okay.  Are you aware of any -- the termination of
22 any services of NIS?
23      A    The services have been terminated for NIS, yes.
24      Q    Is it fair to say that all services with NIS and
25 Port Hamilton have been terminated other than the
```

1    scaffolding since the inception of the TRO?

2        A    Yes.

3        Q    Okay.  And what other services have been

4    terminated?

5        A    Janitorial services, waste management, Hazmat

6    response.

7        Q    And what was the reason for termination?

8        A    Looking at different contractors and their

9    services and how much they cost.  That's what we're

10   doing here.

11       Q    All right.  So you terminated services during the

12   pendency of this TRO, correct?

13       A    Yes.

14       Q    Did you have any hand in referring this matter or

15   the subject of this hearing -- not subject of this

16   hearing -- the subject of your complaint, referred to

17   the U.S. Attorney's Office?

18       A    No.

19       Q    Who did that at your company?

20       A    I am not aware of that myself.

21       Q    You are not aware --

22       A    I don't know.

23       Q    -- that they referred it to the U.S. Attorney's

24   Office?

25       A    No.

74

```
 1      Q   Do you know whether or not Mr. Johnson referred

 2   it?

 3      A   I don't know.

 4      Q   So you have no idea who referred it to the U.S.

 5   Attorney's Office?

 6      A   No.

 7      Q   And you are in charge of all the operations

 8   there?

 9      A   Yes.

10      Q   Okay.  Do you have an internal legal department?

11      A   Mr. Simpson.

12      Q   Internal legal department?

13      A   No.

14      Q   Did you have any participation in the termination

15   of permitting to do work at -- let me start again.  As

16   the Operations Manager of Port Hamilton and Vice

17   President in Charge of Operations at Port Hamilton, did

18   you prohibit NIS personnel from performing services at

19   Port Hamilton?

20      A   Specific -- which services?

21      Q   Scaffolding services?

22      A   No.

23      Q   Have you prohibited them from moving equipment in

24   order to service the equipment?

25      A   No.
```

75

```
 1      Q    Have you prohibited them from challenging -- I'm
 2   sorry, from strapping down equipment?
 3      A    No.
 4      Q    Has Port Hamilton moved any of its scaffolding?
 5      A    No.
 6               ATTORNEY D'AMOUR:  I have no further
 7   questions, Your Honor.
 8               ATTORNEY SIMPSON:  No questions, Your Honor.
 9               THE COURT:  The witness may step down.
10               Attorney D'Amour, arguments?
11               ATTORNEY D'AMOUR:  No, I'm finished.
12               THE COURT:  I understand.  Do you want to
13   make arguments now?
14               ATTORNEY D'AMOUR:  I'm sorry; I misheard.
15               THE COURT:  Before I do that, Attorney
16   Simpson, do you have witnesses to call?
17               ATTORNEY SIMPSON:  I see no need.
18               THE COURT:  Now that the parties have
19   rested, do you have arguments?
20               ATTORNEY D'AMOUR:  Yes, thank you.
21               They've admitted they are terminating
22   personnel during the pendency of this hearing --
23   pendency of this TRO.  I've not been able to get a
24   straight answer on whether or not they are prohibiting
25   the permits that NIS needs to operate, but it is very
```

1    clear that during the pendency of this TRO, by their own

2    admission, they have terminated multiple services that

3    were part and parcel of the services agreement.  I think

4    in and of itself, with nothing else to add to that, I

5    believe that's a violation of the status quo.

6              THE COURT:  Just one moment.  Attorney

7    Simpson.

8              ATTORNEY SIMPSON:  The Temporary Restraining

9    Order governs the conduct of Port Hamilton, not what

10   someone thinks is the status quo.  The Court's order is

11   directed solely to NIS, not directed to Port Hamilton.

12   When Port Hamilton came to me and said we want to

13   terminate the scaffolding services, I read the Temporary

14   Restraining Order.  I said there is nothing that

15   prohibits it, but don't do it because we don't want to

16   have anything that can be argued that we interfered with

17   their ability to come in and inventory or strap down or

18   any of the things they wanted to do that they haven't

19   done.  The janitorial services are not a part of this in

20   any way.  The waste management, the hazardous materials

21   handing is not a part of this in any way.  We have not

22   violated the Temporary Restraining Order whether by the

23   letter of the law or the principle of it.

24             THE COURT:  As of this moment, the Notice

25   has been filed --

```
 1                    ATTORNEY D'AMOUR:  Thank you.
 2                    THE COURT:  -- which then divests this Court
 3      of further jurisdiction.
 4                    ATTORNEY D'AMOUR:  Thank you, Your Honor.
 5                    THE COURT:  I don't believe that there is
 6      anything further that I can address at this moment so
 7      that concludes this matter.
 8                    (Whereupon, the hearing in the matter was
 9                    concluded at 1:21 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  CERTIFICATE OF REPORTER

2      I, DEVY KHOU, a Registered Professional

3  Reporter and Official Court Reporter of the Superior

4  Court of the Virgin Islands, do hereby certify that

5  the foregoing pages, 1 through 78 inclusive, comprise a

6  full, true, and accurate transcription of the foregoing

7  proceedings in Port Hamilton Refining and

8  Transportation, LLP, vs National Industrial Services,

9  LLC, Case No. SX-2024-CV-00282, as taken from my

10  machine shorthand notes on Wednesday, September 19,

11  2024.

12      IN WITNESS WHEREOF, I affix my

13  signature this 19th day of September 2024.

14

15

16  _____

17  DEVY KHOU, RPR
    Official Court Reporter II

18

19

20

21

22

23

24

25

